IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


------------------------------------------------------- :
CARMELLA WALSH,                       : CASE NO.  1:07-CV-00613-LW
                                      :
                         Plaintiff    : <u>MEMORANDUM OF OPINION AND</u>
                                      : <u>ORDER GRANTING DEFENDANTS'</u>
            -vs-                      : <u>MOTION FOR SUMMARY JUDGMENT</u>
                                      :
                                      :
NATIONAL ENTERPRISE SYSTEMS,          :
INC., et al.                          :
                                      :
                      Defendants.     :
------------------------------------------------------- :


UNITED STATES DISTRICT JUDGE LESLEY WELLS


        Plaintiff, Carmella Walsh, initiated this lawsuit alleging violation of her rights

under the Family Medical Leave Act ("FMLA") and other claims after she lost her

position as a collector at National Enterprise Systems, Inc. following a prolonged illness.

In addition to her claims under FMLA, Ms. Walsh seeks compensation under theories of

promissory estoppel, disability discrimination under O.R.C. 4112.02, public policy

wrongful termination, and intentional or improper interference with her prospective

employment relations. (Docket #1). The complaint also names Camille Satullo, an

employee services/human resources manager for NES, as a defendant.  NES and Ms.

Satullo will be collectively referred to as "NES."

        On 8 January 2008, NES moved for summary judgment (Docket #13).  Ms.

 Walsh opposed NES's motion (Docket #19) and NES replied (Docket #20).  For the

reasons discussed below, the Court will grant Defendants' motion for summary judgment.

### I.    BACKGROUND

NES "manages and collects past due debts and accounts receivables for its clients." (Complaint, Docket #1, at ¶1; Answer, Docket #3, at ¶1).  Ms. Satullo works as an employee services/human resources manager for NES. (Deposition of Ms. Satullo, Docket #18, at 8:6-7).   Ms. Walsh was employed at NES as a collector from 16 March 2004, until 6 October 2005.  (Complaint ¶16; Answer ¶13).  Ms. Walsh was considered to have voluntarily resigned on 6 October 2005, after she did not return to work following the expiration of her 12 weeks of leave under the FMLA.  (Affidavit of Ms. Satullo at ¶19, attached as Exhibit 1 to NES's motion for summary judgment; NES letter to Ms. Walsh, dated 20 October 2005, attached as Exhibit 3 to the deposition of Ms. Walsh, Docket #14).

Ms. Walsh requested and took one week of leave under the FMLA in April 2005, after she was diagnosed with pneumonia.  (Walsh dep. 22:2-8).  Ms. Walsh extended her FMLA leave commencing on 2 May 2005.  (Satullo aff. ¶4; Walsh dep. 22:16-20) because she was still suffering from symptoms related to her pneumonia.  (Walsh dep. 22:24-23:1).  Because Ms. Walsh had not returned to work after her initial leave, Ms. Satullo mailed a packet of documents to Ms. Walsh, which included: (1) a cover letter dated 23 May 2005, noting the requested leave period; (2) a form entitled "Family and Medical Leave Request Form"; (3) a form entitled "Response to Employee Request for FMLA Leave," which advised Ms. Walsh, among other things, that her request for leave would "be counted against [her] rolling 12 month FMLA leave entitlement"; (4) a form

2

entitled "Fitness for Duty Certification"; and (5) a payroll form showing four days of accrued vacation.  (Satullo Aff. ¶5; exhibit one thereto).  Ms. Walsh contacted Ms. Satullo "at some point in late May or early June," and advised her that she had not received the packet of papers.  (Satullo Aff. ¶6).   Ms. Satullo faxed the medical certification form to Ms. Walsh's doctor, faxed the other documents to Ms. Walsh's mother, as Ms. Walsh requested, and mailed another copy of all of the documents to Ms. Walsh via certified mail.  (Id.; certified mail receipt, Exhibit 2 thereto).  Ms. Walsh denies receiving any of the forms except for the cover letter and the medical certification form. (Walsh dep. 33:24-34:12).  Ms. Walsh returned to work on 25 June 2005, at which point she had used 39 days of FMLA leave. (Satullo Aff. ¶7).  Ms. Walsh recalls returning to work in June 2005.  (Walsh dep. 23:2-5).

Ms. Walsh took another leave under FMLA from 22 August 2005, through 8 September 2005, for surgery "for her sinuses and breathing problems." (Satullo Aff. ¶¶8-9).  Ms. Walsh stated that she took leave in August 2005, for surgery to repair her deviated septum. (Walsh dep. 23:8-10).  Ms. Walsh stated she was on leave for approximately a week and-a-half and returned to work in the end of August.  (Id. at 23:16-19).   Ms. Walsh states that she was diagnosed with asthma following this leave period.  (Walsh dep. ¶22).

Ms. Walsh took her final leave commencing 28 September 2005.  (Satullo Aff. ¶13), after she had an asthma attack and was transported from work to the hospital via ambulance. (Walsh dep. 23:20 - 24:14; Satullo dep. 96:16-24).  Ms. Satullo states that she spoke to Ms. Walsh by phone on 28 September 2005, and advised her that she had one week of FMLA leave remaining.  (Satullo Aff. ¶13; Satullo notes, Exhibit 7 thereto).

3

Ms. Satullo states that she also advised Ms. Walsh that any additional leave after the expiration of her FMLA leave would not be protected.  Id.  Ms. Walsh next contacted Ms. Satullo after she was discharged from the hospital on 5 October 2005. (Walsh dep. 36:5-9).  Ms. Walsh maintains that during this telephone conversation, she asked Ms. Satullo how much FMLA leave she had remaining and that Ms. Satullo told her she would "get back to" her but did not do so.  (Walsh dep. 37:25-28; 40:9-15).  Ms. Walsh stated that by her calculations at that time, she thought she had enough leave remaining to protect her until the middle of November 2005.  (Walsh dep. 39:4-8).

Ms. Satullo's recollection of this sequence of events is different.  She states that she spoke to Ms. Walsh on 4 October 2005, and that Ms. Walsh told her that she would return to work on 6 October 2005. (Satullo Aff. ¶15).  Ms. Satullo received a voice-mail message from Ms. Walsh's doctor on 5 October 2005, advising her that Ms. Walsh would not be returning to work on 6 October 2005, because she had a doctor's appointment.  (Id.; Satullo notes, Exhibit 9 thereto).  Ms. Satullo states that she then contacted Ms. Walsh and advised her that her FMLA leave would expire in two days. Id.  Ms. Walsh's leave was exhausted on 7 October 2005. (Satullo Aff. ¶16; leave tracking spreadsheet, Exhibit 10 thereto).  Ms. Satullo indicates that she spoke to Ms. Walsh on 7 October 2005, and advised her that her FMLA leave had expired and that "additional leave time was no longer protected under the FMLA[.]"  Id.

The next communication between the parties was by telephone on 13 October 2005. (Satullo Aff. ¶18) or 12 October 2005. (Walsh dep. 40:18-20).  During this conversation, Ms. Walsh states that she advised Ms. Satullo that she had a doctor's appointment in the "next couple of days," after which she would find out when she could

4

return to work. (Walsh dep. 40:22-25).  Ms. Walsh states that she was worried about losing her job but that Ms. Satullo told her that she would not lose her job if she kept the company informed, by phone or via medical documentation, on a continuous basis, (Walsh dep. 41:5-13).  Ms. Satullo denies that she made these statements and testified that she "never would have said those words." (Satullo dep. 97:4-24).  Instead, Ms. Satullo states that she "again explained to [Ms. Walsh] that she had no more available approved leave time [because h]er FMLA leave was exhausted."  (Satullo Aff. ¶18; Exhibit 9 thereto).  Ms. Satullo also states that Ms. Walsh was unable to give her a "definitive date upon which she would be returning to work" during this conversation.  Id.

On 20 October 2005, Ms. Satullo, on behalf of NES, sent a letter advising Ms. Walsh that pursuant to NES's FMLA policy, "as she was advised in previous FMLA correspondence[,]" she was considered to have voluntarily resigned for failure to return to work effective 6 October 2005. (Satullo Aff. ¶19; 20 October 2005 letter).    Ms. Walsh states that she saw her doctor on 20 October 2005, and that she would have returned to work the next day if she had not received the letter (Walsh dep. 59:7-13), but admits she did not advise NES of when she would return to work. (Walsh dep. 69:10-13).   Ms. Walsh acknowledges that she understood NES's FMLA policy, knew that she was entitled to 12 weeks of leave, and knew that an employee who did not return to work after the expiration of FMLA leave would be considered to have voluntarily resigned. (Walsh dep. 26: 2-27:24; 76:8:24).

Ms. Walsh states that NES discriminated against her because of her disability and the fact that she took FMLA leave.  According to Ms. Walsh, the discrimination began when she was called into a meeting with Ms. Satullo and an NES supervisor,

5

John Miterko on 16 September 2005, and was issued a "coaching notice"[1] related to her performance.  (Walsh dep. 49:17-50:6; Exhibit 4 to Walsh dep.; Satullo Aff. ¶10). During the meeting, Ms. Walsh was advised that her fee average of $4,718.00 was below the company average and profitability mark and that she would have to "improve dramatically." (Satullo Aff. ¶10; coaching notice).  Ms. Walsh's health problems were not discussed during this meeting. (Satullo dep. 79:2-5).  Several days later, Ms. Walsh met with Ms. Satullo regarding the coaching notices (Satullo Aff. ¶11).  Ms. Walsh was concerned that "NES was holding her to the same production goals as employees who had not taken FMLA time off." (Walsh brief in opposition at 3; Walsh dep. 52:11-17; Satullo Aff. ¶11).   Ms. Walsh was subsequently informed that her "production numbers had been revised to account for her FMLA absences."  (Walsh brief in opposition at 3; Satullo Aff. ¶11; coaching notice).  Ms. Satullo testified that she did not do these calculations and she did not know exactly how it was done. (Satullo dep. 74:13-75:10).

Ms. Walsh also claims that NES refused to accommodate her asthma and her chronic obstructive pulmonary disease ("COPD"). (Walsh dep. 61:5-10).  Ms. Walsh states that, although her condition continues, her asthma is under control with medication; she had only one asthma attack in 2007; and she does not experience any day-to-day symptoms associated with asthma. (Walsh dep. 61:11-62:25).  Ms. Walsh states that she asked Chris Pollock, the general manager of NES, if she could transfer to another department (the monitoring department), a less stressful environment, because her doctor did not know what was causing the asthma attacks. (Walsh dep.

---

[1]Neither party defines, describes, or sets forth the purpose and impact of a "coaching notice" and the portion of the NES employee manual related to employee performance is not part of the record.

63:13-24).  Despite the fact that another employee told her there were positions available in the monitoring department, Mr. Pollock told her there were no other positions available. (Id. 64:1-10).

Ms. Satullo acknowledges Ms. Walsh's request for a transfer but states that Ms. Walsh asked to be transferred to a department without any production goals. (Satullo Aff. ¶12; Satullo notes, Exhibit 6 thereto).  Ms. Walsh was advised that NES did not have such a department. Id.  However, Ms. Satullo states, that on 30 September 2005, she met with Mr. Pollock to discuss the possibility of transferring Ms. Walsh to the skip-tracing department because "it is much less intense than collections."  (Satullo Aff. ¶14; Satullo dep. 64:20-65:6).  Mr. Pollock agreed to the transfer and to continue paying Ms. Walsh the same base pay rate. (Satullo Aff. ¶14; Satullo dep. 65:7-18).  Ms. Satullo states that she advised Ms. Walsh by telephone that a transfer had been approved if she was interested, but Ms. Walsh hedged responding to the offer. (Satullo dep. 65:21-67:1).

Ms. Walsh also states that NES refused to accommodate her disability when it did not grant her doctor's request that she work reduced hours.  Ms. Walsh states that, several weeks after her asthma attack, she asked Mr. Pollock for reduced hours because of her condition and provided Mr. Pollock and her supervisor with documentation from her doctor supporting her request. (Walsh dep. 64:11-65:17; Exhibit D to Satullo dep.).  Ms. Walsh states that she was told that someone would get back to her about this request and in the meantime, she would have to continue work full time. (Walsh dep. 66:2-5).   After she had her asthma attack and was hospitalized, Ms. Walsh

7

followed up on her request and was told by her supervisor that he still had not gotten a response to her inquiry. (Walsh dep. 66:8-15).

Ms. Walsh believes that NES caused her asthma attack by refusing to accommodate her condition.   Ms. Walsh testified that her supervisor "relentlessly harped on her for missing work, even though [she] was exercising her FMLA rights." (Walsh brief in opposition at 3; Walsh dep. 77:4-80:7).  Ms. Walsh indicates that despite being informed of her condition, her supervisor told her that she needed "to spend 90 percent of [her] time [at work] no matter what [her] condition."  (Walsh dep. 78:16:18). Ms. Walsh acknowledged, however, that she does not know if her supervisor played any role in her termination and no other individuals at NES made any comments, negative or otherwise, about her condition. (Walsh dep. 80:13-18).  Ms. Walsh indicates that because of her condition, she has been instructed not to do "any kind of exercise type stuff." (Walsh dep. 75:22).

## II.    SUMMARY JUDGMENT STANDARD

When "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment shall be entered in favor of a moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323;  see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir.1991) (moving party has the "burden of showing that the pleadings, depositions, answers to

8

interrogatories, admissions and affidavits in the record, construed favorably to the

nonmoving party, do not raise a genuine issue of material fact for trial", quoting

Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987)).  The burden then shifts to the

nonmoving party who "must set forth specific facts showing that there is a genuine issue

for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986), quoting Fed. R.

Civ. P. 56(e)).  Thus, "[o]nce the moving party has met its initial burden, the nonmoving

party must present evidence that creates a genuine issue of material fact making it

necessary to resolve the difference at trial."  Talley v. Bravo Pitino Restaurant, Ltd., 61

F.3d 1241, 1245 (6th Cir.1995).  Read together, Liberty Lobby and Celotex stand for the

proposition that a party may move for summary judgment by demonstrating that the

opposing party will not be able to produce sufficient evidence at trial to withstand a

motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50.  Street v. J.C.

Bradford & Co., 886 F.2d 1472, 1478 (6th Cir.1989).

　　　Once the burden of production has shifted, the party opposing summary

judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is

not sufficient to "simply show that there is some metaphysical doubt as to the material

facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986);

see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th

Cir.1994) (marking as standard that the plaintiff must present "more than a scintilla of

evidence in support of his position; the evidence must be such that a jury could

reasonably find for the plaintiff").  Rather, Rule 56(e) "requires the nonmoving party to

go beyond the [unverified] pleadings" and present some type of evidentiary material in

support of its position.  Celotex Corp., 477 U.S. at 324.  Summary judgment "shall be

9

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted).

### III.    LAW AND ANALYSIS

### A.    FMLA (Counts One and Two).

Ms. Walsh asserts that NES denied her rights under the FMLA and retaliated and/or discriminated against her for exercising her FMLA rights.

Under the FMLA, qualifying employees are entitled to up to twelve weeks of unpaid leave each year "if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  Edgar v. JAC Products, Inc., 443 F.3d 501, 506, quoting 29 U.S.C. § 2612(a)(1)(D)). The parties do not dispute that Ms. Walsh was entitled to 12 weeks of FMLA leave or that the leave Ms. Walsh took commencing in April 2005, through 6 October 2005, was FMLA leave.

Qualifying employees who return to work within that 12-week period are entitled to be reinstated to their previous position, or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  Generally, "an employer does not violate the FMLA when it fires an

10

employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave."  Edgar, 443 F.3d at 506-07, citing Cehrs v. Northeast Ohio Alzheimer's Research Center, 155 F.3d 775, 784-85 (6th Cir.1998) (finding no FMLA violation because the evidence was undisputed that the employee would not have been able to return to work by the statutory deadline);  Williams v. Toyota Motor Mfg., Ky., Inc., 224 F.3d 840, 845 (6th Cir. 2000) (concluding that an employee had suffered no harm when she was terminated because she was unable to resume her duties by the end of the FMLA leave period), *rev'd on other grounds*, 534 U.S. 184 (2002).  Once the 12-week period ends, employees who remain "unable to perform an essential function of the position because of a physical or mental condition ... [have] no right to restoration to another position under the FMLA."  29 C.F.R. § 825.214(b).

The Sixth Circuit acknowledges two separate theories upon which a party can recover under the FMLA: "(1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)."  Killian v. Yorozu Automotive Tennessee, Inc., 454 F.3d 549, 555 (6th Cir. 2006), quoting Hoge v. Honda of America Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004).  Ms. Walsh alleges claims under both theories.

Initially, this Court notes that NES has established that Ms. Walsh's FMLA leave expired as of 6 October 2005. (Satullo Aff. ¶16, leave tracking spreadsheet, exhibit ten thereto).   Ms. Walsh has not argued that NES's calculations are incorrect; she merely argues that by her calculations, she "thought" she was entitled to leave until the middle of November 2005. (Walsh dep. 39).   Ms. Walsh acknowledges, however, the dates of

11

her leave and these dates support NES's calculations.  Id.  Thus, there is no genuine issue of material fact that Ms. Walsh's FMLA leave expired on 6 October 2005.

          1.       Retaliation/Discrimination.

      To establish an FMLA discrimination/retaliation claim, Ms. Walsh must demonstrate that: "(1) she was engaged in an activity protected by the FMLA; (2) [NES] knew that she was exercising her rights under the FMLA; (3) after learning [that she was exercising her] FMLA rights, [NES] took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action."  Killian, 454 F.3d at 556;  Arban v. West Publ'g Corp., 345 F.3d 390, 404 (6th Cir. 2003).  Ms. Walsh "bears the burden of demonstrating a causal connection."  Arban, 345 F.3d at 404.   Once Ms. Walsh establishes her prima facie case, the burden then shifts to NES to provide evidence of a legitimate, non-discriminatory reason for the adverse employment action.  Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir. 2001), citing Mcdonnell Douglas Corp., 411 U.S. 792, 802-04 (1973).   If NES meets its burden, the burden shifts back to Ms. Walsh to demonstrate that the offered reason is pretext for unlawful discrimination.  Skrjanc, 272 F.3d at 315, citing McDonnell, 411 U.S. at 804-06.   NES argues that Ms. Walsh did not establish her prima facie case because she cannot demonstrate a causal connection between the exercise of her FMLA rights and her termination.  Ms. Walsh asserts that the facts she argued to support her state law discrimination claim preclude summary judgment in favor of NES on this claim.

      Ms. Walsh cites the following facts in her discussion of her state law discrimination claim: (1) NES recalculated her production number to account for her

12

FMLA absences without explanation as to how the number was calculated; (2) NES did not have any problems with Ms. Walsh's performance until she missed work after which NES issued a "coaching notice"; (3) NES refused to accommodate her; (4) NES lied to her about her job security; and (5) Ms. Walsh's manager "scolded" her because she was missing too much work and "nothing could be done about the harassment." (Walsh Brief in Opposition at 13).   NES argues that none of these facts establish a causal connection because Ms. Walsh was terminated solely because her FMLA leave had expired and pursuant to company policy.

This Court does not need to determine if the facts set forth by Ms. Walsh create a genuine issue of material fact as to causation because, even if they did, NES has established a legitimate, non-discriminatory reason for Ms. Walsh's termination.  "[I]n retaliation cases where the medical information known to the employer prior to the termination decision shows that the employee could not return within 12 weeks, Cehrs and the DOL regulation can be invoked by employers as a legitimate, nondiscriminatory reason for discharging the employee[.]"  Edgar, 443 F.3d at 513-14.   Although Ms. Walsh states that she would have returned to work had she known her leave had expired, it is undisputed that the evidence before NES, at the time she was terminated, was that Ms. Walsh was not medically cleared to work at the time her leave expired (6 October 2005).   Ms. Walsh's doctor advised Ms. Satullo on 5 October 2005, that Ms. Walsh would not be returning to work on 6 October 2005. (Satullo Aff. ¶15).  Ms. Walsh testified that she told Ms. Satullo on 12 October 2005, that she had a doctor's appointment in the next couple of days during which she would find out when she could return to work.  (Walsh dep. 40:22-25).   Ms. Walsh asserts that it was during this 12

13

October 2005 conversation that Ms. Satullo told her not to worry about her job but, even

were that true, Ms. Walsh acknowledged that on the date of this phone call, she was not

medically cleared to return to work.  Id.   Ms. Walsh further testified that her doctor

would have cleared her to return to work the Monday after her 27 October 2005

appointment. (Walsh dep. 60:3-11).  Because Ms. Walsh has provided no evidence that

she was medically cleared to work on or before 6 October 2005, she will be unable to

demonstrate that the reason offered by NES for her termination was pretextual.

Summary judgment will be granted in favor of NES on Ms. Walsh's

retaliation/discrimination claim under FMLA.  Cehrs, 155 F.3d at 785.

        2.        Entitlement/Interference

Ms. Walsh next argues that NES violated the "entitlement provision" of the FMLA

because it interfered with her right to reinstatement following leave.

To establish an FMLA interference claim, Ms. Walsh "must demonstrate that: (1)

she was an eligible employee; (2) [NES] was an employer as defined under the FMLA;

(3) [she] was entitled to leave under the FMLA; (4) [she] gave [NES] notice of her

intention to take leave; and (5) [NES] denied [her] FMLA benefits to which she was

entitled."  Killian, 454 F.3d at 556; Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir.

2005).

Ms. Walsh has presented no evidence that she was entitled to take leave or be

reinstated under the FMLA after 6 October 2005, or that she advised NES of her intent

to take such leave, or that NES denied her a statutorily required reinstatement.  As

noted above, Ms. Walsh had exhausted her FMLA leave as of 6 October 2005, and,

thus, she was not entitled to further leave of which she could advise NES, and after

14

which notice NES would be required to reinstate her.  Moreover "[i]n entitlement cases,

Cehrs and the DOL regulation provide a defense to liability, regardless of whether the

medical evidence revealing the employee's inability to return to work is available before

or after the termination decision."   Edgar, 443 F.3d at 513.  As noted above, it is

undisputed that on the date of termination, NES knew that Ms. Walsh was not medically

cleared to return to work.  Further evidence, discovered during the course of litigation,

demonstrates that Ms. Walsh was not cleared to return to work until 15 January 2006.

(Exhibit 5 to Walsh dep.).[2]

Ms. Walsh argues that NES "should be equitably estopped from asserting that

[Ms. Walsh] was not entitled to reinstatement under the FMLA." (Walsh Brief in

Opposition at 14).  Ms. Walsh maintains that she relied upon Ms. Satullo's

representations "that you are not going to lose your job." (Walsh dep. 41:6-7).

To successfully invoke the doctrine of equitable estoppel, Ms. Walsh must

demonstrate:

> (1) conduct or language amounting to a representation of material fact; (2)
> awareness of true facts by the party to be estopped; (3) an intention on
> the part of the party to be estopped that the representation be acted on, or
> conduct toward the party asserting the estoppel such that the latter has a
> right to believe that the former's conduct is so intended; (4) unawareness
> of the true facts by the party asserting the estoppel; and (5) detrimental
> and justifiable reliance by the party asserting estoppel on the
> representation.

Mutchler v. Dunlap Memorial Hosp., 485 F.3d 854, 861 (6th Cir. 2007), quoting

Armistead v. Vernitron Corp., 944 F.2d 1287, 1298 (6th Cir. 1991).

---

[2]Ms. Walsh identifies Exhibit 5, entitled "Continuing Disability: Physician's Disability Statement,"
but testified that she did not remember seeing the 15 January 2006 date on that form.

Equitable estoppel does not apply to this case because the only evidence of a misrepresentation is Ms. Walsh's self-serving recitation of Ms. Satullo's alleged statements, which is contradicted by Ms. Satullo's deposition testimony, affidavit, and the notes she made of all communications with Ms. Walsh.  A non-moving party cannot avoid summary judgment "merely on the basis of allegations; significant probative evidence must be presented to support the complaint."  Gregg, 801 F.2d at 860; see, also, American Speedy Printing Centers, Inc. V. AM Marketing, Inc., 69 Fed.Appx. 692 (affirming summary judgment because an affidavit, wholly unsupported by the record, does not create a genuine issue of material fact).  Moreover, Ms. Satullo's alleged promise does not make a misrepresentation as to FMLA eligibility.  See Davis v. Michigan Bell Telephone Co., 543 F.3d 345, 353 (6th Cir. 2008) (holding that equitable estoppel does not apply when employer made no "forward-looking promises with respect to [the employee's] eligibility").   Neither do the facts demonstrate that Ms. Walsh justifiably relied upon Ms. Satullo's alleged statements.  On the date that the statements were allegedly made, Ms. Walsh's FMLA leave had already expired and her doctor had not yet cleared her to return to work.  Ms. Walsh acknowledged her awareness of the FMLA leave policy, and has not provided any evidence that challenges the date her leave expired.  NES is not estopped from refusing to reinstate Ms. Walsh under the FMLA.

Because Ms. Walsh cannot establish that NES denied interfered with and/or denied her a FMLA benefit to which she was entitled, summary judgment will be granted in favor of NES on Counts One and Two of Ms. Walsh's complaint.

16

**B.      Promissory Estoppel (Count Three)**.

Ms. Walsh argues that she has presented genuine issues of material fact to support her claim for promissory estoppel.  Ms. Walsh maintains that she relied upon Ms. Satullo's promise that her job was secure to her detriment.  The Supreme Court of Ohio "has adopted the doctrine of promissory estoppel as set forth in the Restatement of the Law 2d, Contracts (1981), Section 90." Ed Schory & Sons, Inc. V. Soc. Natl. Bank, 75 Ohio St.3d 433, 439 (1996).   To survive a motion for summary judgment on promissory estoppel claim, Ms. Walsh must provide evidence of each of the following elements: (1) a clear and unambiguous promise by NES to her; (2) that she relied upon the promise; (3) that her reliance was reasonable and foreseeable; and (4) that she was injured by her reliance.  Doe v. Adkins, 110 Ohio App.3d 427, 437 (1996); Healey v. Republic Powdered Metals, Inc., 85 Ohio App.3d 281, 284 (1992).  "Furthermore, the party who asserts the promissory-estoppel claim bears the burden to prove by clear and convincing evidence all the elements of the claim."  Dailey v. Craigmyle & Sons Farms, L.L.C., 177 Ohio App.3d 439, 446-47 (2008).

As noted above, the only evidence of a promise is Ms. Walsh's deposition testimony about what Ms. Satullo allegedly told her.  This testimony, however, is contradicted by Ms. Satullo's deposition testimony, her affidavit, and her personnel notes.  Even were this Court to determine, viewing the evidence in a light most favorable to Ms. Walsh, that Ms. Satullo's statements constituted a clear and unambiguous promise of job security, Ms. Walsh cannot establish that she reasonably relied upon Ms. Satullo's alleged promise for the reasons set forth in our discussion of Ms. Walsh's equitable estoppel argument.  Moreover, because Ms. Walsh was not

17

medically cleared to return to work on the date that the promise was allegedly made, she cannot demonstrate that she detrimentally changed her position based upon the alleged promise.

Ms. Walsh has not established a genuine issue of material fact demonstrating that she reasonably relied upon NES's alleged promise and/or that she detrimentally changed her position in reliance upon NES's alleged promise.  Summary judgment will be granted in favor of NES on Count Three of Ms. Walsh's complaint.

### C.  Disability Discrimination and Failure to Accommodate under O.R.C. 4112.02 (Counts Four and Five)

Ms. Walsh asserts that she was terminated due to her disability and that NES failed to engage in the required interactive process to determine a reasonable accommodation for her disability in violation of O.R.C. 4112.02.  NES asserts that: (1) Ms. Walsh's condition is not a disability because there is no evidence that shows that her condition "substantially limits one or more major life activities"; (2) Ms. Walsh was not terminated because of her disability; (3) NES articulated a legitimate non-discriminatory reason for their actions; (4) Ms. Walsh has not demonstrated that NES's reason was pretext; and (5) NES engaged in the interactive process of determining a reasonable accommodation for Ms. Walsh.  (NES Motion for Summary Judgment at 14, quoting O.R.C. 4112.01(A)(13); NES Reply at 8-12).

O.R.C. 4112.02(A) states:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or

18

privileges of employment, or any matter directly or indirectly related to employment.

To establish a prima facie case of disability discrimination, Ms. Walsh must demonstrate (1) that she had a disability, (2) that an adverse employment action was taken by an employer, at least in part, because of her disability, and (3) that she, though disabled, "can safely and substantially perform the essential functions of the job in question."  Columbus Civ. Serv. Comm. v. McGlone, 82 Ohio St.3d 569, 571; Hazlett v. Martin Chevrolet, Inc. (1986), 25 Ohio St.3d 279, 281.[3]  Ms. Walsh must also demonstrate NES's discriminatory intent under the framework set forth in McDonnell Douglas, supra.  Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm. (1981) 66 Ohio St.2d 192, 197.  Thus, if Ms. Walsh successfully establishes her prima facie case, the burden shifts to NES to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Id. at 197.  If NES successfully meets its burden, the burden shifts back to Ms. Walsh to demonstrate that NES's stated reason is pretextual.  Id.

With regard to Ms. Walsh's failure to accommodate claim, Ohio law states: :

An employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business.

---

[3]This Court's analysis will also be governed, in part, by the Americans with Disabilities Act of 1990, 104 Stat. 328 (the "ADA") because, "[a]s a general matter, Ohio courts look to federal regulations and case law interpreting the ... ADA, 42 U.S.C. §§ 12101-12203, for guidance when applying Ohio disability discrimination laws."  Witte v. Rippe & Kinston Systems, 358 F.Supp.2d 658, 661 (S.D. Ohio 2005), quoting Rhoads v. Board of Educ., 103 Fed.Appx. 888 (6th Cir. 2004), citing City of Columbus Civil Serv. Comm'n, 82 Ohio St.3d 569, supra.

Ohio Adm. Code 4112-5-08(E)(1); <u>Shaver v. Wolske & Blue</u>, 138 Ohio App.3d 653, 663 (2000); <u>Martinez v. Ohio Dept. of Adm. Serv.</u>, 118 Ohio App.3d 687, 695 (1997). "Federal courts have recognized that the duty of an employer to make a reasonable accommodation also mandates that the employer interact with an employee in a good faith effort to seek a reasonable accommodation." <u>Shaver</u>, 138 Ohio App.3d at 664; <u>Taylor v. Phoenixville School Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999).  To establish her failure to accommodate claim, Ms. Walsh must demonstrate all of the elements of a disability discrimination claim set forth above and demonstrate that NES failed to make a reasonable accommodation for her disability.  <u>Shaver</u>, 138 Ohio App.3d at 664; <u>Taylor,</u> 184 F.3d at 311-12. "The McDonnell Douglas prima facie case and burden-shifting analysis does not apply in a failure-to-accommodate case." <u>Shaver</u>, 138 Ohio App.3d at 663; <u>Bultemeyer v. Fort Wayne Community Schools</u>, 100 F.3d 1281, 1283-1284 (7th Cir. 1996).

Neither of Ms. Walsh's claims under O.R.C. 4112.02 can survive summary judgment unless she can establish a genuine question as to whether she has a disability.  Under Ohio law, a "'[d]isability' means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working[.]" O.R.C. 4112.01(A)(13).  "Whether a person has a disability under the ADA is an individualized inquiry." <u>Black v. Roadway Express, Inc.</u>, 297 F.3d 445, 449 (6th Cir. 2002).

Ms. Walsh has been diagnosed with asthma and COPD.  She takes medication to keep her condition under control. (Walsh dep. 61:14-25).  Ms. Walsh testified that she

20

only had one asthma attack in 2007 (Walsh dep. 62:4-7) and does not experience any

daily symptoms of her condition. (Walsh dep. 62:22-25).  Ms. Walsh testified that

because of her condition she cannot do "exercise type stuff."  (Walsh dep. 75:22).  Ms.

Walsh finally testified that in the late summer/early fall of 2005, stress may have

aggravated her condition. (Walsh dep. 63:15-20).

In considering whether the foregoing creates a question of material fact as to

whether Ms. Walsh is disabled under O.R.C. 4112.01, this Court is mindful of the

broader protections, specifically related to the disability determination, afforded to

plaintiffs under the recent amendments to the ADA, which became effective 1 January

2009.  See P.L. 110-325 (September 25, 2008) ("ADA Amendments Act").  The Sixth

Circuit, however, recently stated that the ADA Amendments Act should be applied

prospectively only if the plaintiff seeks prospective relief.  Jenkins v. National Bd. Of

Medical Examiners, 2009 WL 331638 at *1-2 (February 11, 2009) (holding that the ADA

Amendments Act applied, despite the fact that the case was pending when the

amendments became effective, because medical student sought additional time on

future ACT and MCAT examinations because of a reading disorder).  See also Verhoff

v. Time Warner Cable, Inc., 299 Fed.Appx. 488, 492 (6th Cir. 2008) (holding that the

ADA Amendments do not apply to a case commenced after the enactment of the ADA

Amendments Act but before its effective date).  Ms. Walsh's case was pending prior to

both the enactment and effective dates.  Moreover, Ms. Walsh seeks damages, not

prospective relief.  This Court will apply the law existing on the date this case was filed.

See Landgraf v. USI Film Products, 511 U.S. 244, 247 (1994) (holding that provisions of

the Civil Rights Act of 1991, which created a right to compensatory and punitive

21

damages for violations of Title VII, did not apply to cases already pending on appeal when the statute was enacted because damages are "quintessentially backward looking" Id. at 282).

Ms. Walsh's position at NES required her to sit at a desk and make telephone calls to collect money, meeting certain production levels.[4]   "[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002), *overturned by* Pub. L. 110-325 (Jan. 1, 2009)[5], citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii) (2001).  "The impairment's impact must also be permanent or long term."  Id.  The terms of the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled."  Toyota, 534 U.S. at 197.  "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment.  Id. at 198.  Under the ADA, those "claiming the Act's protection [are required] to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial."  Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999) (holding that monocular vision is not invariably a disability, but must be analyzed on an individual basis, taking into account the individual's ability to compensate for the impairment).  "In determining whether an individual is substantially limited in a major life

---

[4]Other than a general description of the job duties of a collector, there is no evidence in the record of the physical aspects of Ms. Walsh's job at NES.   Ms. Walsh only indicated that it was stressful.

[5]See discussion related to Pub. L. 110-325, *infra* at 21-22.

activity, the regulations state that courts should consider: '(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" Black, 297 F.3d at 449, quoting 29 C.F.R. § 1630.2(j)(2).

Ms. Walsh has not provided any evidence of how her asthma, which effects her ability to "do exercise stuff," would be an impairment that is of "central importance to most people's lives," or even her own life.   Ms. Walsh testified that her only hobby is camping.  (Walsh dep. 74:14-15).  She has not provided any evidence of how asthma would have limited her ability to make phone calls for NES[6] and/or whether taking medication at that time would have ameliorated that limitation.  Ms. Walsh has testified that her condition is now being controlled by medication and that she has not had recent asthma attacks and does not suffer from daily symptoms.  Based on the foregoing, Ms. Walsh has not created a genuine question as to whether her asthma substantially limits her in a major life activity.

Because Ms. Walsh has not met her burden of establishing a genuine issue of material fact that she was disabled, she cannot establish the first element of either the disability discrimination or failure to accommodate claims, and NES will be entitled to summary judgment on both claims.

---

[6]As previously noted, Ms. Walsh testified that the position she held at NES was stressful and indicated that her doctor *thought* stress might have contributed to her asthma attack. (Walsh dep.63:15-24). She did not provide any evidence to support her testimony or the doctor's supposition.  To the extent that Ms. Walsh is attempting to argue that the major life activity at issue is working itself, she has not made any arguments that her condition makes her unable to work in a "broad class of jobs." Black, 294 F.3d at 452.

**D.** **Public Policy Wrongful Termination (Count Six).**

In her complaint, Ms. Walsh asserts that public policy should protect persons with disabilities from discrimination and retaliation and that she was wrongfully terminated in violation of this policy.  In its motion for summary judgment, NES argues that a claim for public policy wrongful discharge cannot lie when a statutory remedy (Ohio Revised Code Chapter 4112) as stated in Leininger v. Pioneer Natl. Latex, 115 Ohio St.3d 311. Ms. Walsh does not oppose NES's motion related to this claim.

To establish a claim for public policy wrongful discharge, Ms. Walsh must demonstrate:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

Leininger v. Pioneer Natl. Latex, 115 Ohio St.3d 311, 313 (2007), quoting Painter v. Graley, 70 Ohio St.3d 377, 384 (1994), quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399.

Regarding the clarity element, O.R.C. 4112.02 demonstrates a clear public policy against disability discrimination.  See Leininger, 115 Ohio St.3d 311, 315 (holding that

24

O.R.C. 4112.12(A) establishes that there is a clear public policy against age discrimination thus satisfying the clarity element).

Regarding the jeopardy element, "it is clear that when a statutory scheme contains a full array of remedies, the underlying public policy will not be jeopardized if a common-law claim for wrongful discharge is not recognized based on that policy." Id. at 317.  "[T]he jeopardy element necessary to support a common-law claim is not satisfied, because [O.]R.C. Chapter 4112 adequately protects the state's policy against age discrimination in employment through the remedies it offers to aggrieved employees." Id. at 319.   Although analyzing an age discrimination case, the Supreme Court of Ohio, in Leininger, relied upon the existence of four remedies[7] available under O.R.C. 4112, three of which apply in disability discrimination cases.[8]  See id. at 317. The Court adopts the reasoning set forth in Leininger and finds that Chapter 4112 of the Ohio Revised Code provides remedies sufficient to avoid jeopardizing the public policy against disability discrimination.

Ms. Walsh cannot establish that the public policy against discrimination and retaliation will be jeopardized if she is not afforded common-law protection.  NES will be entitled to summary judgment on this claim.

---

[7]The Leininger court also referenced O.R.C. 4112.14(B), which provides a remedy specific to age discrimination.

[8]O.R.C. 4112.02(N) allows for legal or equitable relief; O.R.C. 4112.05(G) requires the Ohio Civil Rights Commission to issue a cease and desist order; and O.R.C. 4112.99 "makes violators of R.C. Chapter 4112 "subject to a civil action for damages, injunctive relief, or any other appropriate relief." Leininger, 115 Ohio St.3d at 317.

25

**E.**     **Interference with Prospective Employment Relations (Count Seven).**

Ms. Walsh alleges in her complaint that NES interfered with her ability to get a job by inducing or causing others not to enter into an employment relationship with her. (Complaint at ¶52).  During her deposition, Ms. Walsh stated that she had a hunch that NES interfered because she was unable to find a job for six months and one month after she added the notation, "please do not call NES" to her resume, she obtained a job. (Walsh dep. 69:21-71:8).  NES argued in its motion for summary judgment that a mere hunch was not sufficient evidence to support this claim.  Ms. Walsh does not oppose NES's motion on this claim.

In order to establish a claim for tortuous interference with a business relationship or contract, a plaintiff must demonstrate: "(1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." Brookeside Ambulance, Inc. v. Walker Ambulance Serv., 112 Ohio App.3d 150, 155-156 (1996), citing Kenty v. Transamerica Premium Ins. Co., 72 Ohio St.3d 415, 419 (1995) and A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council, 73 Ohio St.3d 1, 14 (1995).   A claim for intentional interference with business relationship also includes an interference with prospective contractual relations.  Dolan v. Glouster, 173 Ohio App.3d 617, 630 (2007).  Malice is also a required element.  A & B-Abell, 73 Ohio St.3d at 14.

There is nothing in the record to establish any of the elements of this claim.  A cause of action cannot lie when it is based solely on speculation.  See Ashcroft v. Mt.

<u>Sinai Medical Ctr.</u>, 68 Ohio App.3d 359, 366 (1990) (holding that rumor and speculation is not sufficient to establish a tortious interference with contract).

NES will be entitled to summary judgment on this claim.

**IV.  CONCLUSION**

For the reasons set forth above, this Court grants defendants' motion for summary judgment with respect to all of plaintiff's claims against them and plaintiff's complaint is dismissed.

IT IS SO ORDERED.

/s/Lesley Wells
UNITED STATES DISTRICT JUDGE

Dated: <u>18 March 2009</u>

27